## SOUTH CAROLINA STEAM-BOAT CO. *v.* THE NELLIE FLOYD AND CARGO.

*(District Court, D. South Carolina.* June 3, 1889.)

1. SALVAGE—WHAT AMOUNTS TO—AWARD.

The three-masted schooner F., in tow of a tug going to sea, went aground on the North breaker, a shoal on the Georgetown bar, about 11 A. M. on Monday. She had on board 2,500 packages of rosin, weighing nearly 400 pounds each, and 42 barrels of turpentine, and was drawing 11 feet 2 inches. The water on the shoal was 7 feet. The tug failing to get her off applied to the steamer P., which was going into Georgetown with a large and valuable cargo. Their efforts failed to move the schooner, and the P. after taking on board some of the rosin, proceeded to Georgetown, secured an extra force, unloaded her cargo, and returned about 10 P. M. The weather in the meantime had become threatening. Her efforts being again unsuccessful, and the tide having fallen, she left for the night, and returned next morning as soon as the tide arose. By the aid of hands procured by the tug, the F. jettisoned about ⅓ of her cargo, thereby reducing her draft to 9 feet 10 inches. The P. returned on Tuesday, and succeeded in dragging the F. across the shoal into deep water, and getting her to the dock at Georgetown about 1½ P. M. The wind was very high, and once at least the P. touched bottom in the swell. She also lost her hawser. The peril of the F. was not extreme, but the tug drew too much water to aid her, and there was no other steamer in the vicinity approaching the power of the P. The schooner could not have got off unaided without reducing her draft by two feet, and waiting until the next day's high tide. The P. was a passenger and freight steamer, not engaged in towing, and was worth $25,000. The F. was worth about $12,000, and had left a cargo worth between $3,000 and $4,000. *Held,* that the service was a salvage service, and that the P. should be awarded $1,000 and the price of her hawser.

2. SAME—OFFER TO REBATE.

After the services had been rendered, the master of the P. offered to settle the matter by fixing the salvage at $1,800, $600 to be rebated to the F., which offer was refused. *Held* that, as the offer was made after the services were completed, and without the authority of the libelant, the owner of the P., and led to no result, it should have no effect on the right of libelant to recover.

In Admiralty. Libel for salvage.

*Smythe & Lee,* for libelant.

*J. N. Nathans,* for claimant.

SIMONTON, J. Although this case presents the contradiction in testimony, which too frequently deforms admiralty causes, it is not difficult to determine the essential facts. The Nellie Floyd, a three-mast schooner, in tow of a tug going to sea, went aground on the North breaker, a shoal on the Georgetown bar. This was about high water, 11 A. M. on 4th February, 1889. The schooner drew 11 feet 2 inches. She is ——— feet long, 33 feet beam. On this occasion she had in her 2,500 packages of rosin, weighing nearly 400 pounds each, and 42 barrels of spirits of turpentine. The tug attempted to get her off the shoal. In these efforts she soon got the assistance of the steamer Planter, one of libelant's line, which at that time was crossing the bar on her way to Georgetown, with a large and valuable cargo. The united efforts of the tug and of the Planter failed to move the schooner. The Planter then steamed along-side, and took from the schooner some 62 or 63 packages

of rosin, and proceeded on her way to Georgetown.  The day was calm and clear.  Reaching Georgetown, the Planter put on an extra force of hands, discharged all her cargo, including the rosin, and excepting 50 tons of fertilizers, and at 8 P. M. started for the schooner, reaching her at 10 P. M.  The weather in the mean time had become threatening and windy.  The night was dark.  Backing down towards the schooner from the side of the shoal opposite to that on which she had grounded, the Planter took a hawser from her and again attempted to pull her off, but without success.  The tide falling, the Planter left the schooner, and spent the night at South island, some four miles distant.  She returned early the next morning.  Pilot Romley, who had been on the tug when the disaster occurred, and who was on the schooner when the Planter came up, left the former in a small boat, and boarded the Planter, to aid her master with his advice and experience in his efforts to get the schooner off.  It was agreed that these efforts should be renewed as soon as the master of the schooner put a flag in his rigging indicating that his vessel had begun to thump on the rising tide.  The signal was given. The master of the Planter, having the assurance of the pilot that the depth of water on the shoal was at that time seven feet, (his steamer drew from five to five and one-half feet,) went to the schooner, bent on his own hawser, and again pulled on her.  The schooner, thus in tow, was gradually dragged over the shoal to the side opposite to that on which she had struck, and got off into deep water.  Just before she reached deep water she put up her spanker and mainsail, and soon afterwards her jibs.  While the Planter was engaged in this service, and just about the time the schooner got into deep water, a bridle put on the hawser, and leading to the bow of the steamer, was let go by some of her hands too soon.  It got afoul of her wheel and dragged the hawser with it.  The latter had to be cut out.  As soon as possible the Planter again took the schooner in tow.  The schooner furled her sails, and with the Planter she proceeded to Georgetown, reaching the dock about half past 1 P. M.  The weather on this second day was blustering.  The wind very high from the south-west.  The sea was breaking on the shoal.  Once at least the Planter touched bottom in the swell.  On Monday the tug went to Georgetown with a message from the master of the schooner, for hands and lighters to take cargo from his vessel.  She came back in the afternoon with lighters and hands.  The lighters could not go on the shoal.  The hands went aboard the schooner, and assisted the crew, who had been engaged all day in making jettison of the cargo. This was kept up during a part of the night and of the next day, and 1,000 packages were thrown overboard.  The draft of the schooner was thereby reduced to 9 feet 10 inches.  Some of this rosin floated away. As the specific gravity of the lower grades of rosin is greater than that of water, and much of the cargo was of this low grade, many of the packages sank.  One of the risks of the Planter was from this rosin. The floating packages might foul her paddle wheels; and, tossing on the rough sea of the shoal, her bottom may have come in contact with the staves inclosing the rosin, endangering a leak.  The Planter is a

high-pressure side-wheel steamer, with two engines,—one for each wheel. She has about 350 horse-power. She carries passengers and freight, and is not engaged in the towing business. Her regular course, however, is on the shallow and boisterous waters of this coast, and she carries a long and heavy hawser, ready to render assistance by way of salvage. She is worth $25,000. On the day of successful service she had as cargo 50 tons fertilizers, worth $1,000. The schooner is 10 years old; cost, when built, about $24,000. Roughly estimated, she is worth about $12,000. The cargo left after the jettison is worth between three and four thousand dollars. The evidence is not distinct on these points.

The essential questions in this case are: Was the schooner in peril? Did the Planter contribute to her rescue? The master and mate of the Planter testify strongly in the affirmative of each question. The master and a man who was pilot on the schooner testify in the negative, denying both the peril and the service. There are certain facts, however, which conclude these questions. The Nellie Floyd was aground in the breakers on a shoal of an exposed bar. The greatest depth of water on that shoal with the prevailing tides was 7 feet. She drew 11 feet 2 inches, and, after making jettison of about one-third of her cargo, she drew 9 feet 10 inches. A heavy wind was blowing from the southwest. In his protest, extended after reaching port, the master of the schooner called it a gale. It was so entered on his log. She was on the south side of the shoal. Wind, tide, and waves drove her upon it. The sea was very heavy on the shoal, even at low water. Pilot Romley, who left the schooner in the morning in a small boat to go to the steamer, says that it was dangerous to do so, but that the emergency justified the risk. The master of the schooner, when he got in safely, expressed in warm terms his indebtedness to the Planter for timely, needed, and efficient service. Soon afterwards he called a board of three persons to estimate the value of his vessel in the position on the shoal which he described to them. They agreed on the sum of $4,250,—about one-third of the estimate put on her after she reached the dock. Two efforts had been made to get her off, without success,—one on Monday, with the tug and steamer; one on Monday night, by the steamer alone. When dragged off she was drawing 9 feet 10 inches in a depth of 7 feet of water. It had taken all Monday afternoon, into Monday night, and a part of Tuesday, to take out one-third of her cargo, lessening her draft 1 foot 4 inches. She was rescued at high water. If she had not had the steamer, and intended to reduce draft and use her sails, she could not attempt to get off until the next tide, 12 midnight. As the bar has no lights on it, no vessel crosses it at night. So she had to wait until the next day's tide, say 12:50 P. M. To reduce draft to 7 feet she had to jettison cargo, and reduce her draft 2 feet 10 inches. The one-third already out reduced it but 1 foot 4 inches. So she was in peril, and the Planter rescued her. As the tug drew too much water to aid her, and as there was no other steamer in Georgetown or its vicinity approaching the Planter in power and capacity, the importance of her service is enhanced. Her peril was not extreme, nor was her destruction certain, unless soon re-

lieved. The Planter also encountered peril in rendering the service,—peril requiring ability and courage. The efficient salvage service was rendered on Tuesday. It was rendered promptly, skillfully, energetically, and successfully. She spent a night and nearly one day in the service, and lost her hawser. After the service was rendered, and the schooner safe at her wharf, the master of the Planter suggested to the master of the schooner that, instead of litigating the matter of salvage, they ought to settle it out of court, and that by way of settlement the salvage be fixed at $1,800, of which $600 would be allowed the schooner by way of rebate. This suggestion was at once rejected by the master of the schooner. His proctor insists that this was gross misconduct on the part of the salvor,—such indeed as should diminish, if not forfeit altogether, any award. The practice of requiring and receiving rebates, which pervades so many branches of mercantile life, cannot be too severely rebuked. The rebate is a bribe offered and accepted as an inducement in every instance to disregard, and in very many instances to betray, the interests one or other party is bound to protect. Here the insurer would have been the victim. Had this arrangement been made during the performance of the salvage service; had it been used as an adjustment after the service was rendered; had the offer been made by the authority, sanction, or confirmation of the libelant,—the award would have been seriously affected. It was made long after the service was completed, without any authority or confirmation on the part of libelant, and led to no result. From the high character borne by the master of the Planter I feel sure that he was unconscious of the full meaning of the suggestion. After full consideration of the matter I award for the salvage services in this case the sum of $1,000, besides the price of the hawser,—$125. The testimony of libelant showed some danger of life on the part of the crew of the Planter. They are not parties to this proceeding. At the hearing it was stated that libelant would arrange with them. Let a stipulation in writing to this effect be filled before the award is paid out to the libelant. The salvage award must be paid by the vessel and cargo proportionately. If this proportion needs adjustment the parties have leave to apply at the foot of this decree for any further order necessary. Costs to be paid by respondent.